IN THE UNITED STATES DISTRICT COURT FILED
IN CLERKS OFFICE

FOR THE DISTRICT OF MASSACHUSETTS
2004 OCT 22 P 3: 47

DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| GENESYS CONFERENCING, INC., | CV 04-12055RWZ |
| | (REMOVED ACTION CONTRACT) |
| Plaintiff, | |
| | |
| vs. | |
| | |
| MARGIE MEDALLE, | |
| | |
| Defendant. | |

## DEFENDANT MARGIE MEDALLE'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant Margie Medalle, hereby submits this opposition to Plaintiff Genesys Conferencing Inc.'s, motion for preliminary injunction.

### I. INTRODUCTION.

In the present case, Genesys Conferencing, Inc. ("Genesys" or "Genesys Inc."), seeks a restraint on trade for which it has not bargained, invoking this Court's injunctive powers to impose restrictions on defendant Margie Medalle's ability to earn a living, which it could not obtain through negotiation. The facts do not support Genesys's request; nor does the law permit the relief for which Genesys prays. Genesys asks this Court to impose restrictions on commerce that would prohibit Ms. Medalle from engaging in business, even though the facts demonstrate she is doing so in a manner consistent with her prior contracts with Genesys. Genesys assertions that Ms. Medalle has engaged in conduct contrary to her Employment and Separation Agreements by soliciting Genesys employees to join her current employer, contacted Genesys customers or absconded with Genesys property or secrets are false. Genesys's motion for extraordinary relief should be denied as there is no factual for Genesys's claims.

## II. FACTS.

Ms. Medalle is a very experienced executive who has worked extensively in the teleconferencing business. Ms. Medalle was employed by Aloha Conferencing Services, Inc., ("ACS") in January 1994. Declaration of Margie Medalle ¶ 3 (hereafter "Medalle at ¶ x"). ACS was a Hawaii corporation, doing business in Hawaii, which provided audio teleconferencing services to customers. *Id.* The teleconferencing offered by ACS at this time was primarily audio and video teleconferencing services to small and medium sized business enterprises. *Id.* ACS provided the full range of telecommunications services, including its own operators, equipment and call center. *Id.* Ms. Medalle was first employed by ACS as its Chief Financial Officer, and later promoted to President of the company in 1998. *Id.* ¶ 4. In July 1995, ACS was purchased by Cable and Wireless, Inc., which is a large multinational telecommunications company, that provides a broad spectrum of telecommunications services world-wide. *Id.* ¶ 5. ACS was maintained as a wholly owned subsidiary, with the principal place of its teleconferencing business being located in Honolulu, Hawai'i. *Id.* Genesys acquired ACS from Cable and Wireless, Inc. in April 1999. *Id.* ¶ 6. Genesys was selling teleconferencing services and was a wholly owned subsidiary of Genesys SA, a French corporation. *Id.* Genesys had acquired ACS to begin providing teleconferencing services in North America. *Id.* ACS was the first teleconferencing call center purchased by Genesys in North America. Contrary to paragraph 3 of the Verified Complaint, Ms. Medalle was not employment by Genesys until after April 1999–when it first acquired ACS. *Id.*

Ms. Medalle was employed by Genesys as the Chief Operating Officer ("COO") of its North American Operations beginning in April 1999. *Id.* ¶ 7 Her duties as COO, included, all daily

management of the North American Operations and call centers, including transactions, sales marketing, human resources and financial operations. *Id.* There were approximately 140 employees of Genesys, Inc. at this time and it was producing approximately $12 million in annual sales. *Id.*

In September 1999, Ms. Medalle was promoted to Chief Executive Officer ("CEO") of Genesys, Inc. *Id.* ¶ 8. She was promoted after Genesys Inc. acquired Williams Conferencing ("Williams") in Denver, Colorado the Williams CEO resigned. *Id.* In addition to transactions, marketing, human resources and financial operations, Ms. Medalle's duties as CEO included strategic planning of Genesys, Inc.'s operations, acquisitions and long-range financial planning. *Id.* After the acquisition of Williams, Genesys, employed approximately 350 to 400 employees and produced annual sales of approximately $40 million. *Id.* ¶ 9. All sales and performance targets were met within one year of Williams's acquisition. In that one year, under Ms. Medalle's leadership, the Williams teleconferencing business became profitable for the first time. *Id.* Although Genesys moved its corporate headquarters to Denver, Colorado, after the Williams acquisition, Ms. Medalle continued to reside in Honolulu, Hawai'i, her principal place of business. *Id.* As a result of the quick turnaround of the Williams business, Genesys, Inc., was in position to acquire another company, Vialog, which was a publicly traded company. *Id.* ¶ 12. Genesys, Inc., paid for Vialog with Genesys, Inc., stock and assumed more than $125 million of Vialog's debt. Ms. Medalle was asked to take a demotion to permit appointment of Vialog's male executive (Mr. Kim Miyassi) as CEO of Genesys, even though she possessed equivalent education and much more experience in the teleconferencing business. *Id.* ¶¶ 13-14. The CEO and Chairman of Genesys, SA,

Genesys's parent company explained to Ms. Medalle that the employees of Vialog would not accept a woman as a CEO.  *Id.* ¶ 13.[1]

Contrary to the assertion in paragraph 22 of the Verified Complaint and Exhibit B, thereto, the operative Employment Agreement in place at the time Ms. Medalle's employment with Genesys terminated is attached to her declaration as Exhibit 1.[2] As the Employment Agreement notes, it was executed at the time of the Vialog acquisition in January 2001.    Among other matters the Employment Agreement provides:

    i.    Ms. Medalle was to be employed for a term of three years, beginning on the date of the agreement, January 1, 2001;

    ii.    Ms. Medalle's principal residence for business was Hawai'i;

    iii.    Ms. Medalle's stock options in Genesys would vest immediately upon Genesys's merger into, consolidation with or sale to another company;

    iv.    If the working environment and restructuring resulting from the Vialog acquisition became unpalatable, Ms. Medalle would be paid an amount equivalent to her salary to serve as a consultant to Genesys SA, including accrued bonuses and benefits;

    v.    Any dispute concerning matters related to my employment or the Employment Agreement would be submitted to final binding arbitration, in the City and County of Honolulu, pursuant to the rules of Dispute Prevention and Resolution located there; and

---

    1    After she was demoted to COO, Ms. Medalle discovered that her male replacement was being paid between 40% and 50% more than she had been paid for the same position and responsibilities as Genesys CEO. Medalle ¶ 16. Nine months later, in or about January 2002 after her male replacement left the company, Ms. Medalle was returned to the position of CEO of Genesys, Inc. *Id.* ¶ 17. Her responsibilities and title were the same as those of her predecessor; however, she was paid between 40% and 50% percent less than he. When she requested equivalent pay her request for pay equity was refused. *Id.*

    2    Ms. Medalle understands through correspondence with Genesys's counsel that the original verified complaint has been modified by submission of a substitute exhibit, but , as she cannot review actual documents filed prior to hearing, she is submitting her own copy.

vi.    That the Employment Agreement be construed according to the laws of the State of Hawai'i.

After the Vialog acquisition, and continuing thereafter, Ms. Medalle continued to reside in Honolulu, Hawai'i, which remained her principal business location and residence. At the time she was demoted in favor of Mr. Mayassi, Mr. Legros had told Ms. Medalle that Genesys would restore her to the CEO's position if Mr. Mayassi left the company. Medalle ¶ 21. However, Mr. Legros hired one of the other CEO applicants, Kailash Ambwani, who had no experience managing a teleconferencing business and appointed Mr. Ambwani to the position of Chief Operating Officer for Genesys SA. Ms. Medalle then was required to report to Ambwani. Mr. Ambwani was paid more than Ms. Medalle, even though she had greater experience and expertise in teleconferencing than he and lacked financial and managerial experience in teleconferencing. *Id.* ¶ 24. Ms. Medalle subsequently discovered that a male executive peer (Jim Lysinger) who was in charge of the European business, which produced only 20% of total Genesys, Inc.'s revenue, was being paid a higher salary than she, even though Ms. Medalle was responsible for all of North America, producing over 60-70% of total revenue for Genesys, Inc.

Amendment A to Ms. Medalle's employment agreement provides that she would be paid $837,753.64 upon shareholder (or a consortium of shareholders) acquiring more than 25% of Genesys shares. *See,* Medalle, Exhibit 2. In July 2003 Ms. Medalle was informed that a new shareholder had acquired 19% of the company's shares, and would acquire 30%. She was asked by Mr. Legros to renounce Amendment A. Medalle ¶ 26. When Ms. Medalle refused, Mr. Legros accused her of not being a "team player." *Id.* Mr. Legros made it clear that this relinquishment was a condition of Ms. Medalle continued good standing as an employee of Genesys, Inc., and she

submitted to his demand. *Id.* For relinquishing her contractual right to be paid $837,753.64 under Amendment A, Ms. Medalle was to have received stock options valued at less than half of the amount received under Amendment A and be made president of the company. *Id.* All of the stock options were to have been conveyed to Ms. Medalle in August 2003, but all of the stock options have not been conveyed to her. *Id.* In the ensuing year, the promised stock options have become virtually worthless. *Id.*

After she agreed to relinquish Amendment A, Mr. Legros informed Ms. Medalle that her position of CEO was being eliminated through another "reorganization," and Mr. Legros informed her that Genesys might not fulfill its promise to appoint her President as promised at the time she relinquished Amendment A. *Id.* Furthermore, in direct contradiction to ¶ 1.1(d) of the Employment Agreement, which expressly provides that her principal business residence was the State of Hawai'i, Mr. Legros told Ms. Medalle she would be required to re-locate to Reston, Virginia, from Hawai'i, if she accepted the President's position. *Id.* ¶ 29. This demand was made only after Genesys had obtained Ms. Medalle's relinquishment of Amendment A. *Id.* ¶ 30. Ms. Medalle would not have relinquished the Amendment A if she had known that Mr. Legros and Genesys planned to force her to move in violation of my Employment Agreement. *Id.* ¶ 30. It became apparent that Genesys and Mr. Legros were determined to Ms. Medalle me to move, in violation of the Employment Agreement, and that this demand was being made to force her resignation after obtaining my relinquishment of Amendment A. *Id.* ¶ 31. Mr. Legros requested that she stay on until December 2003, which she did and then signed the Separation Agreement. Medalle, Exhibit 3. Among other matters, the Separation Agreement states:

i.  That Ms. Medalle was being compensated in excess of her annual salary. While factually accurate, this statement does not account for the fact that she had relinquished Amendment A under representations that she would receive stock options that have not been conveyed, and would continue working in her capacity as CEO of Genesys and continue to reside in Hawai'i. By not conveying the options and terminating her employment pursuant to the Separation Agreement, Genesys saved more than $400,000, that it otherwise would have been required to pay Ms. Medalle. *Id.* ¶ 34.

ii.  A waiver and release of claims against Genesys based on consideration that has not been paid, in the form of the stock options;

iii.  A provision prohibiting Genesys from disparaging Ms. Medalle's name, which has not been honored;

iv.  Incorporation of terms and conditions contained in the Employment Agreement.

Genesys did not convey the stock options as indicated in the Separation Agreement and they still have not been transferred to Ms. Medalle. *Id.*

Since her employment with Genesys terminated, Ms. Medalle joined World Class Communications ("WCC"), a company incorporated by Mr. Gary Payne, not Ms. Medalle, as alleged in ¶ 35 of the Verified Complaint. *Id.* ¶¶ 35 & 59-60. Although WCC is not a party to the Separation Agreement, during her employment wtih WCC, Ms. Medalle has not solicited Genesys employees or customers. *Id.* ¶ 39. WCC has purchased leads from Dunn and Bradstreet and is using this information to contact potential customers. *Id.* Ms. Medalle has not violated the terms of the ¶ 4.1 of the Employment Agreement by soliciting or accepting teleconferencing business from Genesys's current customer or potential customers who contacted Genesys within the past two years. *Id.* Ms. Medalle specifically has instructed the WCC sales staff not to accept or solicit such business, even though WCC is not a party nor bound by the Employment or Separation Agreements. *Id.* If, in the course of a sales discussion, it becomes known that a prospective customer is a

customer or was a prospective customer of Genesys within the past two years, the sales staff terminate the conversation and inform the potential customer that WCC cannot communicate further regarding teleconferencing services until the anti-competitive period expires at the end of 2004. *Id.*

Ms. Medalle has not violated ¶ 4.2 of the Employment Agreement, and, specifically, has not disclosed confidential information regarding Genesys as described in that paragraph to WCC or any other entity. *Id.* ¶ 40.

Ms. Medalle has not violated the terms of ¶ 4.3 of the Employment Agreement. Specifically, Mr. Tokuoka and Mr. Fulton, whom Genesys alleges she solicited or hired were <u>former</u> Genesys employees at the time of their employment with WCC. *Id.* ¶ 41. WCC hired them only after their employment with Genesys terminated. *Id.* Ms. Medalle did not "entice" them to join WCC, as Mr. Tokuoka and Mr. Fulton who were both accustomed to receiving high salaries and commissions as Genesys employees were both informed that they will not be receiving any salary with WCC. *Id.* In fact, Mr. Tokuoka resigned from Genesys, Inc. in Colorado, to return to Hawai'i because of his father's illness (cancer), and to assist his elderly and infirm mother. He sought employment here with a private employment agency (Inkinen & Assoc.) and interviewed with Nextel and Coldwell Banker before ever being employed by WCC. *Id.* ¶ 42. Mr. Fulton also had decided leave Genesys, Inc., in Hawai'i, prior to applying for employment with WCC. *Id.* ¶ 44. He resigned after being informed by Genesys, Inc., that there was "no guarantee" that his sales division would remain intact. Mr. Fulton lives in Hawai'i and wishes to remain here with his family. *Id.* His opportunities for similar employment are limited; there are no teleconferencing call centers in Hawai'i other than WCC. *Id.* On July 26, 2004 Mr. Fulton applied for a position with WCC. This application

occurred <u>subsequent</u> to his departure from Genesys, Inc. Shortly thereafter, Mr. Fulton was offered a position with WCC and began work on August 12, 2004. *Id.*

Even though the non-solicitation provisions of the Employment and Separation Agreements apply only to Ms. Medalle's conduct, when an application is received by WCC from a Genesys, Inc., employee, such applicants have been informed of that WCC is not able to discuss employment with Genesys, Inc., employees. *Id.* ¶ 46. This was the practice at WCC before the time Ms. Medalle was sued. *Id.* ¶ 47.

Mr. Tokuoka has continued to speak with Genesys, Inc., employees with whom he enjoys personal or professional relationships. *Id.* ¶ 48. Stacey DelaCruz was a Hawai'i employee who moved to the Denver office when the Hawai'i office was closed in 2002. Ms. Stacey DelaCruz, had a phone conversation with Mr. Tokuoka earlier this year in which she had inquired casually if there were any opportunities at WCC, because her husband Ronald is very unhappy living in Denver and would like to move back to Hawai'i. *Id.* Mr. Tokuoka informed Ms. DelaCruz that Customer Service positions were unavailable at this time. *Id.* Crystal Fisher contacted Mr. Tokuoka to seek advice in applying for his old position at Genesys, Inc.. Mr. Tokuoka encouraged her pursuit of that position. *Id.* ¶ 49. Elise Makanani initially sent an unsolicited e-mail to Mr. Tokuoka on August 16, 2004, inquiring about job opportunities with WCC. She later phoned Mr. Tokuoka to ask if she could stop by and see some of her friends at the WCC office. She had expressed a desire to move back to Hawai'i because she missed family ties. At the time of her visit requested and submitted an application, but was informed about the non-solicitation policy WCC had implemented, and was told that no web training positions were available. *Id.* ¶ 50.

Finally, with the exception of the voluntary resignations of Mr. Tokuoka and Mr. Fulton, all other WCC employees previously employed by Genesys, Inc., had been terminated by Genesys, Inc., prior to being employed by WCC. *Id.* ¶ 51. Operators terminated after the Genesys, Inc., Honolulu, Hawai'i call center closure in 2002 sought employment with WCC to earn a living in a market where WCC operates the only operator-assisted teleconferencing center. *Id.*

Ms. Medalle has not violated ¶ 4.4 of the Employment Agreement, and, specifically have not taken any of the materials described in that paragraph or have such or any other property that belongs to Genesys in my possession. *Id.* ¶ 52. Contrary to the assertions of ¶ 25 of the Verified Complaint, Ms. Medalle did not have access to research and development documents. *Id.* Contrary to the allegations of ¶ 26 of the Verified Complaint, Mr. Francois Legros was the primary spokesperson for Genesys, Inc. Ms. Medalle participated in only two press conferences in the period from 2002 to 2003. Mr. Legros was the principal public personality of Genesys, Inc. and press statements and other public communications were presented by him or his office during that time. *Id.* ¶ 53.

WCC has only 10 employees and is not a direct competitor of Genesys. *Id.* ¶ 66. Ms. Medalle has proposed to Mr. Legros that Genesys, partner with WCC and provide the services to any potential customers that WCC does not have capacity to serve. *Id.* Ms. Medalle made similar suggestions to Mr. Jim Huzell, COO of Genesys, after he sent her a congratulatory e-mail. Medalle, Exhibit 5. Ms. Medalles resopnded, telling him WCC would like to offer Genesys, Inc.'s services, especially World Wide Web conferencing to WCC's customers, through resale. *Id.* I also told him that WCC would like to refer large customers who sought services beyond WCC's capacity to Genesys, Inc. *Id.* Mr. Huzell discussed Genesys plans to out-source its small and medium sized accounts and operator-assisted accounts to smaller companies like WCC. Based on this

conversation, Ms. Medalle expected WCC would develop a mutually beneficial strategic working relationship with Genesys. *Id.* In that same conversation, Ms. Medalle provided assurances that she continued to comply with the non-solicitation provisions of the Employment and Separation Agreements. *Id.*

With respect to trade secrets, Ms. Medalle does not have access to Genesys, Inc.'s proprietary information such as source code for its software or design project plans for teleconferencing technology. *Id.* ¶ 67. WCC has utilized "off the shelf" software available in the open market to operate its teleconferencing services. *Id.* Nor has Ms. Medalle ever spoken disparagingly about Genesys, to prospective teleconferencing customers or employees nor has she ever disclosed information, which was deemed "confidential." *Id.* ¶ 68.

WCC is unique in Hawai'i in that operates the only operated-attended conference call center located there. *Id.* 69. Genesys, for example, has attempted to move away from operator attended conferencing and has attempted out source such services. WCC offers automated conferencing, but its focus is not on that market, but, rather, on operated attended calling. *Id.* In its current capacity, design and target market, WCC is very distinct from Genesys. WCC is too small to compete in the same market as Genesys, is built on off-the-shelf software and focuses on operator assisted calling, a market Genesys is leaving. *Id.* ¶¶ 69-74. The information and equipment used by WCC are freely available to all teleconferencing companies. *Id.* ¶ 92.

### III. ARGUMENT.

A.    Choice of Law.

The first issue the Court must address which choice of law provision applies in this matter: Hawaii or Massachusetts law? The Employment Agreement, from which the anti-

competitive covenants arise states that it is to be construed in accordance with the laws of the

State of Hawaii. Exhibit 1, ¶ 12.  The Separation Agreement states it is to be construed

according to the laws of the Commonwealth of Massachusetts.  If the Separation Agreement did

not refer to or incorporate the anti-competitive provisions of the Employment Agreement, a more

compelling case could be made for disregarding Hawai'i law.  However, Genesys indisputably

seeks to enforce the restrictive covenants of the the Employment Agreement, not the Separation

Agreement, and it is that choice of law that must apply.

> A federal court hearing a case in diversity must apply the choice-
> of-law rules of the forum state. *Klaxon v. Stentor Electric
> Manufacturing Co., Inc.*, 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S.
> Ct. 1020 (1941). Massachusetts courts give effect to the law
> reasonably chosen by the parties to govern their rights under
> contracts. *Morris v. Watsco, Inc.,* 385 Mass. 672, 674-75, 433
> N.E.2d 886, 888 (1982).

*Shipley Co. v. Clark*, 728 F. Supp. 818, 825 (D. Mass., 1990).  As it is the Employment

Agreement's terms Genesys seeks to enforce, Hawai'i law should control.  Any ambiguity on this

point should be resolved against Genesys, the drafter of both agreements.  This conclusion finds

support in general conflict of law analysis applicable to contracts.  Section 188 of the

RESTATEMENT (SECOND)OF CONFLICTS OF LAWS (1971), directs courts to look to "the local law

of the state which . . . has the most significant relationship to the transaction" to determine a

question of contract interpretation absent an effective choice of law by the parties.  Absent a

choice of law provision, a Massachusetts court would apply a "most significant relationship" test

to determine which state's law would apply. Under this test, a variety of factors would be

considered, including:  1) the place of contracting; 2) the place of negotiation of the contract; 3)

the place of performance; 4) the location of the subject matter of the contract; and 5) the

-12-

domicile, residence, nationality and place of incorporation of the parties. *Dunfey v. Roger*

*Williams Univ.*, 824 F. Supp. 18, 20 (D. Mass. 1993). Applying this analysis, it is clear from Ms.

Medalle's declaration and the undisputed facts that the place of contract, Ms. Medalle's

employment and place of business under the Employment Agreement all were in Hawai'i and

Hawai'i law should control.[3] *Accord, Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473

N.E.2d 662, 669 (Mass. 1985) (*quoting* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188

(1971)).

     B.    Standard for Injunctive Relief.

    A party seeking a preliminary injunction must establish that (1) it is substantially likely to

succeed on the merits of its claim; (2) absent the injunction there is 'a significant risk of

irreparable harm'; (3) the balance of hardships weighs in its favor; and (4) the injunction will not

harm the public interest." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir. 1998).

Likelihood of success is the main bearing wall of this four-factor framework. *Ross-Simons of*

*Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 16 (1st Cir. 1996).

---

    3    Ms. Medalle further asserts that venue more properly is in Hawai'i for these reasons and is preparing a motion to transfer venue the District of Hawai'i. And, though she believes Hawai'i law controls, will support her arguments through reference to relevant Massachusetts law to avoid the consequences of an adverse ruling by the Court on this point.

Injunctions are a form of extraordinary[4] and drastic[5] relief that should not be granted unless the movant, by clear and unequivocal showing,[6] carries the burden of persuasion. *E.g., Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968). Irreparable harm occurs where money damages are an insufficient remedy for the alleged harm. *Klausmeyer v. Makaha V.F., Ltd.*, 41 Haw. 287 (1956). In Massachusetts "economic harm alone ... will not suffice as irreparable harm unless 'the loss threatens the very existence of the movant's business.'" *Tri-Nel Mgmt., Inc. v. Bd. of Health*, 433 Mass. 217, 227-28, 741 N.E.2d 37 (2001). Plaintiff has failed completely to meet its significant burden of bringing forth evidence confirming such harm.

C.    The Facts do no Support the Alleged Harm.

Primarily, Genesys's motion must be denied because there is no proof whatsoever that Ms. Medalle has violated the anti-competitive terms of the Employment Agreement. She states that she has not solicited Genesys's employees, has instructed her co-workers not to do so and the former Genesys employees hired were hired after their employment terminated, voluntarily or involuntarily. They were hired by WCC, not Ms. Medalle and WCC is not a party to the Agreements. The declarations offered in support of the assertion that Ms. Medalle has solicited current Genesys employees is insufficient bases for prospective relief as there is not a shred of evidence offered in support of the claim that she currently is soliciting WCC employees. She

---

4    *See, Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2nd Cir.), *cert. denied*, 394 U.S. 999 (1969).

5    *See, Crochet v. Housing Authority*, 37 F.3d 607, 610 (11th Cir. 1994).

6    *See, Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964).

-14-

states categorically that she has not done so, is not doing so and will not do so. Supposition and

innuendo are insufficient bases upon which to exercise the Court's extraordinary powers.

Similarly, the Declarations of Julius Anderson and Lynne Ross are nothing more than

hearsay and conjecture. They do not state that Ms. Medalle has violated the restrictive terms of

the anti-competitive provisions by: (1) soliciting specific customers; (2) disclosing confidential

information; or (3) removing plans, customer lists reports or similar items from Genesys offices.

Ms. Medalle categorically states she has not done any of these things. Genesys fear that she may

do so before the anti-competitive provisions expire December 31, 2004, is nothing more than

that. A plaintiff seeking relief for misappropriation of trade secrets "must . . . carry the burden of

showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 522 (9th Cir.

1993). In addition to demonstrating the matter is, in fact, secret, the plaintiff must demonstrate,

with particularity, the subject matter of the trade secret "'in a manner that separates it from

matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in

the trade.'" *IMAX Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998),

*quoting, Universal Analytics v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal.

1989)(citation omitted) (emphasis added), *aff'd,* 914 F.2d 1256 (9th Cir. 1990).

*MacNeal-Schwendler Corp.*, is particularly apt. In rejecting the Sherman Act claims, based on

the misappropriation of trade secrets, the *MacNeal-Schwendler Corp.*, court explained that

"secret knowledge acquired and developed as a result of long employment in the particular trade

may be carried over and put to use by the new employer." 707 F. Supp. at 1278. There is no

factual basis upon which to grant the requested dramatic relief sought by Genesys. Ms.

Medalle's long history and training in the field cannot be considered "secret."

-15-

D.    Genesys has not Performed and Cannot Invoke the Restraints on Competition.

*Technicolor, Inc. v. Traeger*, 57 Haw. 113, 551 P.2d 163 (1976), holds that, to be enforceable, an anti-competitive employment agreement must be supported by valuable consideration in the form of additional compensation and a promotion in support of the anti-competitive clause. *Id.* 57 Haw. at 119, 551 P.2d at 169.   In the instant case, Ms. Medalle agreed to the anti-competitive restrictions, in her Employment Agreement, but did not receive the full benefit of her bargain.  Instead, she surrendered her right to $837,753.64 under the Employment Agreement, in exchange for promises Genesys did not fulfill: 115,000 stock options and appointment to the President's position.  Yet Genesys, knowing it has not performed these promises, invokes the Court's equitable powers to keep Ms. Medalle from earning a living in her field of expertise.  The failure of the bargained for consideration and equities both require denial of the requested relief.   Motions for preliminary injunctions are denied where the employer has itself engaged in inequitable conduct. *See Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1380 (N.D. Ga. 2001) (denying employer's motion for preliminary injunction to enforce restrictive covenant where employer regularly hired brokers from competitors and thus engaged in the same conduct it sought to prohibit by injunction); *Salomon Smith Barney, Inc. v. Vockel*, 137 F. Supp. 2d 599, 603 (E.D. Pa. 2000) (denying motion for preliminary injunction to enforce restrictive covenant where employer instructed employee, hired from competitor, to contact his clients from his former employer).  And, before assessing the validity of the terms, the party seeking to enforce the agreement must demonstrate that it is supported by adequate consideration. *Bilec v. Auburn & Associates, Inc. Pension Trust*, 403 Pa. Super. 176, 183, 588 A.2d 538, 541 (1991)(anti-competitive contract must be supported by consideration).

-16-

E.    The Customer Solicitation Covenant is Unreasonable.

In Massachusetts, a restrictive covenant is enforceable if it "is necessary for the protection

of the employer, is reasonably limited in time and space, and is consonant with the public

interest." *Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 716, 175 N.E.2d 374 (1961).

Trade secrets, confidential data, and goodwill are all legitimate business interests of the employer

that it may seek to protect by restrictive covenant. *New England Canteen Serv., Inc. v. Ashley*,

372 Mass. 671, 674, 363 N.E.2d 526 (1977). However, protection from "ordinary competition" is

not a legitimate business interest. *Marine Contractors Co. v. Hurley*, 365 Mass. 280, 287-88, 310

N.E.2d 915 (1974). Nor may an employer prevent an ex-employee from using "the general skill

or knowledge acquired during the course of the employment." *Junker v. Plummer*, 320 Mass. 76,

79, 67 N.E.2d 667 (1946). *Accord, UARCO v. Lam,* 18 F. Supp. 2d 1116 (D. Haw. 1998)

*Technicolor, Inc. v. Traeger*, 57 Haw. 113, 551 P.2d 163 (1976).  Hawaii Revised Statutes §

480-4 states in relevant part:

> (a) Every contract ... in restraint of trade or commerce in the State
> ... is illegal.
>
> *    *    *    *
>
> (c) Notwithstanding the foregoing subsection (b) and without
> limiting the application of the foregoing subsection (a) it shall be
> lawful for a person to enter into any of the following restrictive
> covenants or agreements ancillary to a legitimate purpose not
> violative of this chapter, unless the effect thereof may be
> substantially to lessen competition or to tend to create a monopoly
> in any line of commerce in any section of the State.
>
> *    *    *    *
>
> (4) A covenant or agreement by an employee or agent not to use
> the trade secrets of the employer or principal in competition with

-17-

the employee's or agent's employer or principal ... after the termination of employment, within such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent.

Thus, Hawai'i and Massachusetts law are consistent insofar as they prohibit restraint of trade that is unreasonable and measure the reasonableness of such restraints by the time, place and breadth of the restraint in question.

As a general rule, the construction and legal effect to be given a contract is a question of law. *Lohnes v. Level 3 Communs., Inc..*, 272 F.3d 49, 53 (1st Cir. 2001); *Nadherny v. Roseland Prop. Co.*, 2004 U.S. Dist. LEXIS 4229 (D. Mass., 2004); *Reed & Martin, Inc. v. City & County of Honolulu*, 50 Haw. 347, 348-49, 440 P.2d 526, 527-28 (1968). In the instant action, Genesys seeks to restrain Ms. Medalle from soliciting all of its customers or those were even potential customers withing two years prior to December 31, 2004, anywhere in the world, during the anti-competitive period. Medalle Exhibit 1, ¶ 8. As she has no list of Genesys's "prospective" customers, and that term in undefined, Genesys is free to argue that she is prohibited from selling services to any entity or person in the world who could have purchased teleconferencing services from Genesys, whether or not such entities actually did so.

Such broad unlimited restrictions on Ms. Medalle's activities are overly broad and cannot be considered reasonable in either its geographic or substantive scope. Read literally, it would preclude Ms. Medalle from engaging in the teleconferencing business as she would not be able to sell to any entity that existed during the two year period prior to the expiration of the covenant period. This restriction on customer solicitation is both unreasonable and unlawful. The restriction is a transparent attempt to prevent Ms. Medalle from engaging in a business within

-18-

which she has achieved great success. It is a clause intended not to protect information, but ordinary competition. As such, the customer solicitation provision is unenforceable as written. The law does not provide any protection from ordinary competition. *Orkin Exterminator Co. v. Weaver*, 257 Ark. 926, 930, 521 S.W.2d 69, 71 (Ark. 1975); *HCCT, Inc. v. Walters*, 99 Ohio App. 3d 472, 474, 651 N.E.2d 25 (Ohio App. 1994)(refusing to enforce non-competition clause against hair stylist because no trade secrets were being protected; court characterized enforcement as trying to prevent "ordinary" not "unfair" competition); *Microbial Research Corp. v. Muna*, 625 P.2d 690, 698-99 (Utah 1981). *Marine Contractors Co. v. Hurley*, 365 Mass. 280, 287-88, 310 N.E.2d 915 (1974); *Technicolor. Inc. v. Traeger*, 57 Haw. 113, 122, 551 P.2d 163, 170 (1976).

Nor can her acumen and skill be the basis for such a broad limitation. While true trade secrets or confidential information can support an post-employment agreement not to compete, courts will not enforce such agreements where the information purportedly conveyed to the employee was not, in fact, secret or confidential. *E.g., Copier Specialists, Inc. v. Gillen*, 76 Wash. App. 771, 774, 887 P.2d 919, 920 (1995)(citing numerous cases and stating general rule that skills gained on job are insufficient basis for enforcing non-compete). Such general information knowledge cannot be used to convert an agreement from one in which restraint of trade is primary to one in which it is merely ancillary. *Boisen v. Petersen Flying Service, Inc.*, 222 Neb. 239, 248, 383 N.W.2d 29, 34-35 (1986).

       F.     The Relief Sought is Greater than Allowed by Law.

Not content to keep Ms. Medalle out of fair competition for the period of the restraints, should it prevail, Genesys seeks to obtain an order prohibiting Ms. Medalle from soliciting

Genesys employees for employment for one year from the date of the Court's order. Genesys does so, knowing that, currently, the restriction on solicitation will expire December 31, 2004. And, Genesys further seeks to have Mr. Tokuoka and Mr. Fulton discharged from employment, along with any other former Genesys employees. Ms. Medalle's declaration establishes that she is not soliciting Genesys customers or employees and consistently has taken measures to assure she is meeting her obligations under the Agreements. There is no factual basis for the requested relief.

Additionally, the requested relief is improper as a matter of law. The Massachusetts courts have rejected attempts to broaden injunctive relief beyond that which the restrictive covenants would have granted. *E.g., The Wrentham Co. v. Cann,* 345 Mass. 737, 189 N.E.2d 559 (1963)(rejecting a special master's report recommending that the relief granted be expanded beyond the original time, place and substantive limits contained in the agreements). Even if this Court were to grant relief requested by Genesys, it should not grant relief that exceeds what was bargained for in the anti-competitive provisions. Relief, if any, should expire at the end of 2004.

## IV. **CONCLUSION..**

For the reasons stated herein and in the documents filed in support of this memorandum, Defendant Margie Medalle respectfully requests that this honorable Court deny the Plaintiff's Motion for Preliminary Injunction.

DATED this 22nd day of October 2004, Boston, Massachusetts.

EDWARD J. LONERGAN
Attorney for Defendant
Suite 800
101 Merrimac Street
Boston, Massachusetts 02114-9601
Tel: (617) 371-0430
Fax: (617) 227-7177

## CERTIFICATE OF SERVICE

I Edward J. Lonergan, hereby certify that a true copy of the above document was served upon plaintiff's counsel by hand on this 22nd day of October, 2004.

Edward J. Lonergan